Case 2:20-cv-00213 Document 68 Filed on 05/07/21 in TXSD Page 1 of 16

United States District Court
Southern District of Texas
**ENTERED**
May 07, 2021
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| BRIAN KEITH BALENTINE, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 2:20-CV-213 |
| | § | |
| BENJAMIN P. BRAKO, *et al*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND RECOMMENDATION TO DENY
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

Plaintiff Brian Keith Balentine, proceeding *pro se* and *in forma pauperis*, has filed this prisoner civil rights action pursuant to 42 U.S.C. § 1983. Plaintiff is a prisoner in the Texas Department of Criminal Justice, Criminal Institutions Division (TDCJ-CID) and is currently housed at the Stringfellow Unit in Rosharon, Texas. Pending before the Court is Plaintiff's Motion for Preliminary Injunction. (D.E. 1-2, 12). The undersigned respectfully recommends that Plaintiff's motion seeking preliminary injunctive relief be **DENIED** for the reasons set forth below.

**I. BACKGROUND**

In this civil rights action, Plaintiff sues the following McConnell Unit and TDCJ officials: (1) Benjamin P. Brako, Safe Prisons Sergeant, McConnell Unit; (2) John Doe, UCC Chairman 10-8-18, McConnell Unit; (3) Pamela Williams, Assistant Director for State Classification Committee and Records, TDCJ Huntsville; and (4) Joni White, Deputy Director for State Classification Operations and Support, TDCJ Huntsville. (D.E.

1 / 16

23). Plaintiff generally claims that Defendants have violated his due process and Eighth Amendment rights. He seeks monetary and injunctive relief. Plaintiff also has filed a Motion for Preliminary Injunction. (D.E. 1-2, 12).

On October 9, 2020, the undersigned ordered Plaintiff's First Amended Complaint to be served on Defendants Brako, Doe, Williams, and White. (D.E. 24). Defendants Brako and White subsequently filed an answer. (D.E. 41).

The undersigned further ordered the Office of the Attorney General of the State of Texas (OAG) to file, via an *amicus curiae* brief, a response to Plaintiff's Motion for Preliminary Injunction. (D.E. 25, 33). On November 19, 2020, the OAG filed an "*Amicus Curiae Martinez* Report," which consists of numerous exhibits. (D.E. 34, 36, 37, 38, 39). The OAG did not file a response brief to the Motion for Preliminary Injunction along with its *Martinez* report. The undersigned, therefore, ordered the OAG to file a response brief on or before December 7, 2020. (D.E. 42). The OAG responded that it could not comply with the undersigned's order, citing Fifth Circuit authority that its appearance through an *amicus curiae* response brief would be inappropriate.

On December 3, 2020, the undersigned ordered the OAG to supplement its *Martinez* report with various declarations summarizing Plaintiff's relevant grievances, relevant Unit Classification Committee (UCC) records, relevant Emergency Action Committee (EAC) records, and the relevant TDCJ policies. (D.E. 47, p. 2). Because Defendants Brako and White filed an answer, the undersigned ordered these defendants to respond to the Motion for Preliminary Injunction. (D.E. 47, pp. 2-3).

Defendants and the OAG have submitted their response to the Motion for Preliminary Injunction and supplementary materials, respectively. (D.E. 55, 66). Plaintiff has filed two responses to the OAG's *Martinez* report and supplementary materials. (D.E. 45, 67).

## II.   PLAINTIFF'S ALLEGATIONS AND CLAIMS

Plaintiff alleges the following relevant facts in his First Amended Complaint. Plaintiff, is a homosexual white male, 5'5" tall, and weighs 160 lbs. When Plaintiff came into TDCJ custody in 1990, he was assigned to the McConnell Unit and housed in safekeeping status. Offenders who are smaller, weaker, and vulnerable to assaults are assigned to safekeeping status. Plaintiff was paroled in 2006 but returned to prison in 2009.

Upon his return, Plaintiff was assigned to the Wayne Scott Unit and placed in the general population. In 2010, he was assaulted, beaten beyond recognition, and sexually assaulted. Plaintiff was transferred to the Stiles Unit where he was sexually harassed by other inmates. Plaintiff was placed back in safekeeping status, where he remained until October 16, 2018.

On September 17, 2018, while housed at the McConnell Unit, Sgt. Brako questioned Plaintiff as to how he knew offender Anthony Taylor and whether or not he had any issues with Taylor. Plaintiff informed Sgt. Brako that he and Taylor were roommates at the Hughes Unit for a period of time. Plaintiff alleged Taylor had filed a bogus Offender Protection Investigation (OPI) against Plaintiff at the Hughes Unit so that Taylor could be moved to a prison section where his lover was housed. Plaintiff further

3 / 16

told Sgt. Brako he had no problems with Taylor other than a rumor circulating that Plaintiff had snitched on Taylor for having sex with a general population offender.

On September 19, 2018, Plaintiff was placed in a pre-hearing detention transit status for investigation on whether Plaintiff had sexually harassed Taylor and another offender named Crook. On September 22, 2018, Plaintiff filed a Step 1 grievance to request an OPI, complaining that that he was being "crossed out" on the belief he had snitched on Taylor and that he has not sexually harassing anyone. Rather, Plaintiff was the one who was being sexually harassed.

On September 27, 2018, Plaintiff appeared before the Unit Classification Committee (UCC) at the McConnell Unit. While the McConnell Unit's assistant warden recommended transfer for all the parties involved, Plaintiff's unit transfer request was initially denied. Plaintiff remained officially assigned to the McConnell Unit on safekeeping status.

According to Plaintiff, Sgt. Brako conducted an investigation and found no evidence to substantiate that Plaintiff had sexually harassed offenders Taylor and Crook. Plaintiff never received a disciplinary offense report charging him with any sexual offenses.

On October 8, 2018, Plaintiff went before the UCC a second time. It was chaired by Major John Doe and Sgt. Brako. Major Doe told Plaintiff that the State Classification Committee (SCC) had denied the assistant warden's transfer recommendation. The assistant warden nevertheless appealed that decision. Sgt. Brako confirmed to Major Doe that there was no evidence other than statements from offenders Taylor and Crook that

Plaintiff had harassed them. Major Doe ordered Sgt. Brako to write statements for the offenders who had refused to write statements against Plaintiff.

Plaintiff believed Major Doe had essentially ordered Sgt. Brako to falsify statements against Plaintiff as if they were written by confidential informants to be submitted to the SCC. Major Doe refused to hear from any of Plaintiff's witnesses.

Plaintiff alleged Defendants Doe and Brako conspired to cause Plaintiff to be transferred to the Connally Unit on October 18, 2018 where he was removed from safekeeping status. The Connally Unit is a disciplinary unit, where problem offenders are sent. Upon arrival at the Connally Unit, Plaintiff appeared before that unit's UCC, where he told the Chief of Classification that his transfer was a mistake because he was on safekeeping status and the Connally Unit does not house inmates with safekeeping status. Plaintiff was informed he had been removed from safekeeping because he had sexually harassed other offenders. Plaintiff believes this information in his classification file falsely labeled him as a sexual predator.

While housed at the Connally Unit, Plaintiff lived in constant fear of being physically and sexually assaulted. Plaintiff was threatened by inmates who had learned that Plaintiff used to be on safekeeping status and was a homosexual. Plaintiff was also subjected on occasion to physical, sexual, and emotional abuse.

On July 18, 2019, Plaintiff was interviewed by the unit parole officer, J. Deleon. Deleon told Plaintiff that his chance for parole looked good except for his removal from safekeeping. On August 30, 2019, Plaintiff was denied parole and received a four year

set off which was greater than past set offs. Plaintiff believes that the sexual harassment allegations were used against Plaintiff to deny him parole and to cause a greater set off.

In September 2019, Plaintiff was transferred to the Terrell Unit where he was housed at the time he filed this action. Plaintiff's request to be placed back into safekeeping was denied. Plaintiff has been subjected to sexual harassment at the Terrell Unit as it was well known he used to be on safekeeping status.

On June 15, 2020, Plaintiff filed a grievance at the Terrell Unit to report being assaulted and harassed. On June 20, 2020, Plaintiff wrote a letter to the unit's warden to complain about two offenders who had sexually harassed and abused him. Plaintiff also filed a grievance requesting placement back in safekeeping status. As of June 2020, Plaintiff was housed in special housing transit status due to the OPI he filed on June 20, 2020 regarding the sexual abuse. On June 26, 2020, the warden denied his requests for safekeeping but recommended a unit transfer.

According to Plaintiff, Defendants Williams and White are responsible for the review and approval of inmate transfers and assignment to safekeeping status. These defendants also have final authority for staff appeals of decisions involving classification. Plaintiff states the record was unclear as to who removed Plaintiff from safekeeping status in 2018. Plaintiff believes that, as the final decision makers, Defendants Williams and White ultimately heard the appeal submitted by Defendants Doe and Brako and authorized Plaintiff to be removed from safekeeping status and transferred to the Connally Unit.

Plaintiff generally claims his substantive and procedural due process rights have been violated by Defendants in the manner in which they removed his "safe keeping status." He further raises claims Defendants violated the Eighth Amendment in failing to protect him from the assaults and harassment of other inmates. He further alleges he has been transferred between TDCJ facilities in a manner facilitate assaults upon him and that such transfers were done with punitive intent or deliberate indifference to his health and safety.

### III. PLAINTIFF'S MOTION FOR PLELIMINARY INJUNCTION AND *MARTINEZ* REPORT AS SUPPLEMENTED

Plaintiff seeks preliminary injunctive relief in the form of being placed back into safekeeping status. (D.E. 1-2, 12). Plaintiff filed his motion while he was placed in special transit housing at the Terrell Unit. Plaintiff feared he would be transferred to another unit and placed back in general population where he has a long history of being sexually harassed and abused. Since filing his complaint, Plaintiff has been transferred to the Byrd Unit in Huntsville, Texas (D.E. 13) and then to the Stringfellow Unit in Rosharon, Texas (D.E. 19).

Defendants Brako and White respond that Plaintiff has failed to satisfy the requisite criteria for establishing an entitlement to preliminary injunctive relief. (D.E. 55, pp. 2-7). These defendants further contend that the preliminary relief sought by Plaintiff is not narrowly drawn and would not preserve the status quo. (D.E. 55, pp. 7-8).

In connection with the pending motion seeking preliminary injunctive relief, the OAG has submitted supplemental materials to the *Martinez* report consisting of

declarations from TDCJ official Kim Massey summarizing Plaintiff's relevant grievance records (D.E. 66-1), Plaintiff's relevant UCC records (D.E. 66-2), Plaintiff's relevant EAC records (D.E. 66-3), and the TDCJ's single cell housing policy (D.E. 66-4).

As summarized by Ms. Massey, Plaintiff's UCC records reflect that, following an OPI initiated against Plaintiff on September 25, 2018, the McConnell Unit UCC concluded there was not enough evidence to substantiate Plaintiff had committed sexual abuse or threats of violence but that there was enough evidence to support sexual harassment. (D.E. 66-2, p. 2) The McConnell Unit UCC recommended Plaintiff be transferred to another unit and that he not be placed in the same unit as offenders Crook, David, and Taylor. (D.E. 66-2, p. 2). On or around October 5, 2018, after reviewing allegations that Plaintiff had sexually assaulted Crook, David, and Taylor, the SCC initially decided not to transfer Plaintiff. (D.E. 66-2- pp. 2-3). On October 16, 2018, the SCC removed Plaintiff from safekeeping status and transferred him to another unit after noting multiple allegations of sexual assault and sexual harassment had been lodged against Plaintiff. (D.E. 66-2, p. 3).

The UCC records further reflect that: (1) on August 9, 2019, the Connally Unit UCC reviewed an OPI filed by Plaintiff and determined that his allegation of threats of violence were unsubstantiated; (2) on September 5, 2019, the SCC approved Plaintiff's transfer to the Terrell Unit because a certain offender had been transferred to the Connally Unit and because the Terrell Unit provided services to Native Americans; (3) on June 25, 2020, the Terrell Unit UCC assigned Plaintiff to restricted housing pending a review of an OPI initiated by Plaintiff; (4) on June 26, 2020, the Terrell Unit UCC

recommended that Plaintiff be transferred due to Plaintiff's allegations of threats of violence, sexual harassment, and sexual abuse and that Plaintiff not be housed in the same unit as two other offenders; (5) Plaintiff remained in restricted housing pending the SCC's final decision on whether to transfer Plaintiff; and (6) the SCC classification approved Plaintiff's transfer to the Byrd Unit on July 26, 2020, even though there was no evidence presented to support Plaintiff's allegations. (D.E. 66-2, pp. 3-5).

As summarized by Ms. Massey, Plaintiff's EAC records reflect that Plaintiff's various allegations of sexual assault and sexual abuse against offenders housed at the McConnell Unit, Connally Unit, and Terrell Unit, as referenced above, could not be substantiated. (D.E. 66-3, pp. 2-3). EAC records further reveal that, following an investigation at the McConnell Unit on or around September 25, 2018, there were complaints from offenders in the safekeeping housing area that Plaintiff "wanted to infect others with an infectious disease." (D.E. 66-3, p. 3). Thus, the McConnell Unit administration "believed it was nest for [Plaintiff] to be separated from the safekeeping area due to the possibility of being physically assaulted." (D.E. 66-3, p. 3).

Ms. Massey summarized the applicable TDCJ policy as follows: (1) inmates who require single-cell housing are categorized due to vulnerability and various medical and mental health issues; (2) inmates assigned to safekeeping status are celled together and matched with inmates having "similar characteristics such as physical weakness, sexual orientation, transgender, or other similar traits"; (3) safekeeping offenders may be housed in a single cell if there are no suitable cell partners; (4) the UCC may assign an offender in safekeeping status to a single cell after consideration of several factors, including the

offender's institutional record and behavior; (5) the SCC "has the authority to override the [UCC] decisions related to single cell housing if they determine it to be necessary for the safety, security, and orderly management of the offenders populations"; and (6) offenders may appeal any such classification decision through the offender grievance program. (D.E. 66-4, p. 2).

## IV. DISCUSSION

In order to obtain a preliminary injunction under Federal Rule of Civil Procedure 65, the movant must demonstrate: (1) a substantial likelihood of success on the merits; (2) a substantial threat that the movant will suffer irreparable injury if the injunction is denied; (3) the threatened injury outweighs any damage that the injunction might cause the defendant; and (4) the injunction will not disserve the public interest. *Texans for Free Enterprise v. Texas Ethics Com'n*, 732 F.3d 535, 536-37 (5th Cir. 2013). Injunctive relief is an extraordinary remedy which requires the movant to unequivocally show the need for its issuance. *Sepulvado v. Jindal,* 729 F.3d 413, 417 (5th Cir. 2013) (internal citations and quotations omitted). Plaintiff must carry the burden as to all four elements before a preliminary injunction may be considered. *Voting for America, Inc. v. Steen*, 732 F.3d 382, 386 (5th Cir. 2013) (internal quotations and citations omitted).

### A.  Substantial Likelihood of Success on the Merits

To obtain preliminary injunctive relief, Plaintiff first must demonstrate a likelihood of success on the merits of his lawsuit. *Sepulvado*, 729 F.3d at 417. Plaintiff claims that Defendants' actions violated his Eighth Amendment and due process rights.

### *(1)   Eighth Amendment*

The Eighth Amendment prohibits cruel and unusual punishment.  U.S. Const. amend. VIII. An Eighth Amendment violation occurs when a prison official is deliberately indifferent to an inmate's health and safety.  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).  The test for deliberate indifference has both an objective and subjective prong.

Under the objective prong, the inmate "must first prove objective exposure to a substantial risk of serious harm."  *Trevino v. Livingston*, No. 3:14-CV-52, 2017 WL 1013089, at *3 (S.D. Tex. Mar. 13, 2017) (citing *Gobert v. Caldwell*, 463 F.3d 339, 345-46 (5th Cir. 2006)).  To prove the subjective prong of the deliberate indifference test, the inmate "must show both: (1) that the defendant was aware of facts from which the inference of an excessive risk to the [inmate's] health or safety could be drawn; and (2) that the defendant actually drew the inference that such potential for harm existed." *Trevino*, 2017 WL 1013089, at *3 (citing *Farmer*, 511 U.S. at 397 and *Harris v. Hegmann*, 198 F.3d 153, 159 (5th Cir. 1999)).

In seeking preliminary injunctive relief, Plaintiff contends that he has a history of being assaulted and that prison officials should protect him from future harm by restoring his safekeeping status.  (D.E. 1-2, p. 4).  In response to the evidence presented as part of the *Martinez* report as supplemented, Plaintiff disputes any findings associated with Sgt. Brako's investigation at the McConnell Unit to suggest he sexually assaulted or harassed other inmates.  (D.E. 45, pp. 3-9; D.E. 67, pp. 2-8).  Plaintiff argues instead "[i]t was obvious that the Defendants were not the least concerned about [Plaintiff's] safety when

they removed him from safekeeping status in 2018 and transferred him to the Connally Unit, placing him at risk to be harmed by other offenders." (D.E. 67, p. 8).

The evidence presented by Defendants Brako and White in their *Martinez* report as supplemented contradicts any allegations that prison officials acted with deliberate indifference to Plaintiff's health and safety. These defendants have submitted evidence showing that: (1) Plaintiff's safekeeping status was removed due to numerous allegations that Plaintiff was the aggressor and had sexually abused and harassed other inmates; (2) the UCCs of the McConnell, Connally, and Terrell Units conducted investigations into Plaintiff's claims of being assaulted and recommended, even in the absence of evidence substantiating his claims, transferring Plaintiff to other units and designating that Plaintiff not be housed with his alleged assailants; and (3) the SCC has ultimately approved Plaintiff's various transfers and housing designations, including his transfer to the Byrd Unit on July 26, 2020.

Rather than demonstrate that TDCJ officials, including the named Defendants, were aware of and ignored any risk of substantial harm to Plaintiff, the available evidence instead reflects that prison officials took steps to address Plaintiff's complaints at the various units and alleviate potential risks of harm. Plaintiff is now housed at the Stringfellow Unit. Plaintiff has neither alleged nor submitted any evidence to suggest that he is currently at substantial risk of serious harm or that the named defendants are aware of any risk of such harm to him. Plaintiff, therefore, has failed to establish at this time a substantial likelihood of success on the merits of his Eighth Amendment claim.

### (2) Due Process

The Supreme Court has consistently held that a prisoner has no constitutional right to be confined in any particular place or otherwise avoid being transferred to another prison. *See Wilkinson v. Austin*, 545 U.S. 209, 221 (2005) ("[T]he Constitution itself does not give rise to a liberty interest in avoiding transfer to more adverse conditions of confinement."); *McKune v. Lile*, 536 U.S. 24, 39 (2002) ("It is well settled that the decision where to house inmates is at the core of prison administrators' expertise."); *Sandin v. Conner*, 515 U.S. 472, 478 (1995) ("the Due Process Clause did not itself create a liberty interest in prisoners to be free from intrastate prison transfers."); *Meachum v. Fano*, 427 U.S. 215, 224 (1976) ("The conviction has sufficiently extinguished the defendant's liberty interest to empower the State to confine him in any of its prisons."). Likewise, "a prison inmate does not have a protectible liberty or property interest in his custodial classification[,] and an inmate's disagreement with a classification is insufficient to establish a constitutional violation." *Neals v. Norwood*, 59 F.3d 530 , 533 (5th Cir. 1995).

In view of these well-settled principles and the evidence presented in the *Martinez* report as supplemented, Plaintiff cannot establish at this time a substantial likelihood of success on the merits of his due process claims challenging the removal of his safekeeping status and various prison transfers.

### B.  Irreparable Harm

Second, in order to obtain preliminary injunctive relief, Plaintiff must show he will suffer irreparable harm if the injunction is denied. *Sepulvado*, 729 F.3d at 417. While

Plaintiff indicates he is likely to suffer a serious injury if not returned to safekeeping status, such complaints of irreparable harm are speculative at best. As noted above, Plaintiff has provided the Court with no indication that he is currently at risk of imminent injury while housed at the Stringfellow Unit. Thus, Plaintiff fails to demonstrate a substantial threat that he will suffer irreparable injury if the injunction is denied.

### C. Remaining Elements

Under the third and fourth elements, Plaintiff must demonstrate that the threatened injury outweighs any damage that the injunction might cause the defendant and that the injunction will not disserve the public interest. *Sepulvado*, 729 F.3d at 417. His allegations of irreparable harm do not amount to a constitutional violation at this stage in the proceedings, and in the absence of such a violation, federal courts are reluctant to interfere in the internal affairs of a state prison system. *See Richie v. UTMB Hospital Galveston*, No. 2:12-CV-322, 2012 WL 12871940, at *2 (S.D. Tex. Oct. 18, 2012) (citing *Kahey v. Jones*, 836 F.2d 948, 950 (5th Cir. 1988)).

Lastly, interference with TDCJ policies related to Plaintiff's classification and housing assignments at this early stage in the proceedings would not be in the public's interest without a without a full opportunity for the facts to be developed beyond Plaintiff's allegations. *See Kahey*, 836 F.2d at 951. Should Plaintiff be able to prove a constitutional violation to a trier of fact, then permanent injunctive relief might be appropriate at some point in the future with respect to his claims. Accordingly, Plaintiff has failed to demonstrate either the third or fourth elements of the preliminary injunctive standard.

14 / 16

## V.     RECOMMENDATION

For the foregoing reasons, it is respectfully recommended that Plaintiff's Motion for a Preliminary Injunction (D.E. 1-2, 12) be **DENIED**.

Respectfully submitted this 7th day of May 2021.

_____
Jason B. Libby
United States Magistrate Judge

## **NOTICE TO PARTIES**

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel. Within **FOURTEEN (14) DAYS** after being served with a copy of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to Fed. R. Civ. P. 72(b), 28 U.S.C. § 636(b)(1), General Order No. 2002-13, United States District Court for the Southern District of Texas.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within FOURTEEN (14) DAYS after being served with a copy shall bar that party, except upon grounds of *plain error,* from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Court. *Douglass v. United Servs. Auto Ass'n,* 79 F.3d 1415 (5th Cir. 1996) (en banc).